**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————————————x

                         :  Case No. 00-CV-621 (JAP)

IN RE LUCENT TECHNOLOGIES INC.,   :
SECURITIES LITIGATION            :
                         :
                         :

———————————————————————————x     **OPINION**

**APPEARANCES**

MILBERG WEISS BERSHAD HYNES & LERACH LLP
David J. Bershad, Esq.
Jerome M. Congress, Esq.
Patrick L. Rocco, Esq.
Elaine S. Kusel, Esq.
Mary Lynne Calkins, Esq.
One Pennsylvania Plaza
New York, NY 10119-0165

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Max W. Berger, Esq.
Daniel L. Berger, Esq.
Steven B. Singer, Esq.
Jeffrey N. Leibell, Esq.
Javier Bleichmar, Esq.
1285 Avenue of the Americas
New York, NY 10019

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Seth R. Lesser, Esq.
One University Place
Suite 516
Hackensack, NJ 07601

Co-Lead Counsel for the Class

CRAVATH, SWAINE & MOORE
Paul C. Saunders, Esq.
Daniel Slifkin, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

LINDABURY, McCORMICK & ESTABROOK, P.A.
John H. Schmidt, Jr., Esq.
53 Cardinal Drive
Westfield, NJ 07091

> Counsel for Defendants Lucent Technologies, Inc.,
> Richard A. McGinn, Donald K. Peterson, and
> Deborah C. Hopkins

PISANO, District Judge.

This is a consolidated securities class action brought on behalf of all persons or entities who purchased Lucent common stock between October 26, 1999 and December 20, 2000 (the "Class Period") and suffered damages as a result (the "Class" or "Plaintiffs").  Before the Court is the Class's motion to approve a settlement of this matter and the plan of allocation.  Defendant Lucent Technologies, Inc. ("Lucent") does not oppose this motion.  The parties have resolved this action as part of a global settlement of what were originally fifty-three separate lawsuits against Lucent and various current and former Lucent directors, officers, and employees.  A Stipulation and Agreement of Settlement dated September 22, 2003 (the "Stipulation" or "Settlement") is the outcome of that global settlement and the painstaking efforts made in negotiating it.  The Settlement requires Lucent, among other things, to pay or cause to be paid to the Class cash, stock, and warrants valued at approximately $517 million when the shareholders were sent notice of the Settlement.[1]  Today, given that the value of the warrants increases as the share price increases, the Settlement is worth approximately $610 million.

On December 12, 2003, this Court held a fairness hearing on the settlements reached in five Lucent actions pending before this Court:  *In re Lucent Technologies, Inc. Securities*

---

[1] The value was $517 million when the Court preliminarily approved the Settlement in September 2003. (*See* Ct.'s Prelim. Order entered Sept. 24, 2003.)

*Litigation*, 00-cv-621 (JAP), *Laufer, et. al. v. Lucent Technologies, et. al.*, 01-cv-5229 (JAP),

*Pallas v. Schact*, et. al., 02-cv-2460 (JAP), *Cooper v. Schact, et. al.*, 02-cv-4260 (JAP), and

*Reinhart & Smith v. Lucent Technologies, Inc., et. al.*, 01-cv-3491 (JAP). In an Order and Final

Judgment entered December 15, 2003, the Court approved the Settlement.  Though the Court

executed a Final Judgment and Order, the Court informed the parties that it would subsequently

enter this Opinion on the motion to approve the settlement and plan of allocation.[2]  Accordingly,

for the reasons explained below, the Court approves the Settlement for the Class under Rule

23(e) of the Federal Rules of Civil Procedure, consistent with this Court's Order and Final

Judgment entered December 15, 2003.

## I. Background

### A. The Parties

The Lead Plaintiffs are Teamsters Locals 175 & 505 D & P Pension Trust Fund (the

"Pension Trust Fund") and The Parnassus Fund and Parnassus Income Trust/Equity Income

Fund ("Parnassus").  The Pension Trust Fund is a multi-employer pension trust organized in

West Virginia and created under collective bargaining agreements between a number of

employers and Teamsters Local Nos. 175 and 505.  Co-Lead Plaintiff Parnassus, which was

founded in 1984 and is located in San Francisco, has a principal investment objective of long-

term growth of capital.  It invests solely in companies that practice corporate social

responsibility.

The Court appointed the Lead Plaintiffs under the Private Securities Litigation Reform

Act of 1995 (the "PSLRA"), and the Court appointed the law firms Milberg Weiss Bershad

---

[2] At the hearing, the Court reserved on the issues of attorney's fees and reimbursement of costs and expenses.  The Court does not address either of these issues here, but shall rule on fees and costs in a separate, subsequent opinion.

Hynes and Lerach LLP and Bernstein Litowitz Berger and Grossmann LLP as Co-Lead Counsel for Plaintiffs and the Class (collectively referred to as "Co-Lead Counsel".)

The Defendants are Lucent, Richard A. McGinn, Donald K. Peterson, and Deborah C. Hopkins.  Defendant Lucent is a Delaware corporation with its principal place of business and chief executive offices located at 600 Mountain Avenue, Murray Hill, New Jersey.  Lucent designs, builds, and installs a wide range of public and private networks, communications systems, date networking systems, business telephone systems and microelectronics components, and manufactures integrated circuits and optoelectronic components for the computer and telecommunications industries.

At all relevant times, Defendants Richard A. McGinn ("McGinn"), Donald K. Peterson ("Peterson"), and Deborah C. Hopkins ("Hopkins") served in the following capacities.

McGinn was Lucent's President, Chief Executive Officer and Chairman of its Board of Directors from February 1996 until October 22, 2000.  Relevant to this action, McGinn signed Lucent's 1999 Annual Report on Form 10-K and frequently made statements reported in press releases and other publicly disseminated materials.

Peterson was Lucent's Chief Financial Officer and Executive Vice President until March 1, 2000.  Peterson signed the 1999 Form 10-K.

Hopkins joined Lucent on April 24, 2000, as Chief Financial Officer. Hopkins was responsible for executive management and oversight of all financial operations for the Company. Hopkins issued many of the allegedly misleading statements.

4

**B. The Litigation**

**1. The Allegations Against the Defendants**

The Plaintiffs's allegations are pleaded in a Fifth Amended Complaint. Plaintiffs allege that by mid-1999, Lucent misrepresented that it was at the "'forefront'"of the competition within the telecommunications industry and that it anticipated continued growth. (Fifth Compl. ¶ 3.) At the beginning of the Class Period, Lucent allegedly had fallen behind in developing its optical networking products capable of running at "OC-192" speed, experiencing loss of sales and revenues. (*Id.* ¶ 4.)  Lucent's problems with product design, reliability, and timeliness of deliveries throughout its product lines caused customer dissatisfaction and order cancellations. (*Id.*)  Additionally, Lucent developed problems with AT&T, its largest and most important customer, because it was unwilling to manufacture to AT&T's specifications and unable to adequately develop products that met AT&T's changing requirements. (*Id.*)

At this time, Lucent's management acknowledged internally that its optical networking group was in "'serious disrepair'" and that Lucent, as a result, was "'up against a revenue wall.'" (*Id.*)  Externally, the public learned the same.  An October 24, 2000 Wall Street Journal article, *Lucent Ousts McGinn as CEO and Chairman*, reported that Lucent senior executives had informed McGinn that Lucent needed to reduce public projections of revenue and earnings because new products were not yet ready for sale and sales of older products had declined.  (*Id.* ¶ 6.)  Plaintiffs allege that McGinn failed to heed this instruction, and Lucent, consequently, failed to advise investors of its declining business. (*Id.*)

Moreover, Plaintiffs allege that Lucent and the Individual Defendants took various steps to conceal from the investing public the Company's true financial situation. (*Id.* ¶ 7.)   They claim that Lucent, among other things, misrepresented actual demand for its optical networking

products. (*Id.*)  According to Plaintiffs, Lucent failed to disclose that customer demand for optical networking products had decreased even when it was producing at a rate slower than its competitors and discovering persistent technological problems with its products. (*Id.*)  As a result, Defendants allegedly knew that potential customers were deserting Lucent, preferring instead competitor companies that were successfully deploying newer OC-192 capable products. (*Id.*)

Faced with a declining product demand, Lucent allegedly inflated its reported sales by shipping unready products. (*Id.* ¶ 8.)  Specifically, in September 1999, Lucent's optical networking head, Harry Bosco, told the Company's directors at a meeting in Germany that Lucent had a strategy to ship faulty optical networking products before solving their design and technical problems.  (*Id.*)  Though this decision was intended to increase reported sales, it exacerbated Lucent's existing problem regarding poor product quality and further diminished product acceptance and sales. (*Id.*)

According to Plaintiffs, Lucent's accounting improprieties began during the first quarter of fiscal year 2000 (ended December 31, 1999) and continued throughout the class period. (*Id.* ¶ 9.)  Plaintiffs allege that Lucent's most senior officers knew throughout the class period that: (1) Lucent's accounting practices violated generally accepted accounting principles ("GAAP")*;* (2) Lucent had improperly booked hundreds of millions of dollars of revenue on sales to customers when customers had not ordered products; (3) Lucent had improperly booked hundreds of millions of dollars of revenue on shipments to distributors even though Lucent's senior officers had specifically granted these distributors the right to ultimately return unsold products; (4) Lucent sales people were routinely entering into "'side deals'" with distributors to allow them to return the product while improperly reporting these deals as current sales; and (5) Lucent was

"'stuffing'" its distributors with products they did not want, did not need, and had not ordered. (*Id.* ¶ 9.)

On January 6, 2000, Lucent announced that the Company would miss analysts's earnings estimates for the first quarter of fiscal year 2000. (*Id.* ¶ 10.)  At that time, McGinn allegedly made false assurances regarding the strong demand for the Company's optical networking products, attributing the principal causes of the shortfall to manufacturing constraints that limited the Company's ability to fulfill customer orders.  (*Id.*)

Throughout the Spring and Summer of 2000,  McGinn and Lucent allegedly continued to reassure the investing public of a strong demand for the Company's products. (*Id.* ¶ 11.) However, by this time Lucent lost all business for its newest optical networking products with its largest customer, AT&T, and had internally declared a "'sales crisis.'"  (*Id.*)  By no later than the end of Lucent's fiscal year 2000 second quarter, which ended March 31, 1999, Lucent's most senior officers had explicitly recognized that "'[a]s the first half of 2000 comes to a close, it is clear that we cannot continue with the current operational model -- it just doesn't work.'" (*Id.*) Still, Lucent's reported results for the March quarter met expectations, and its share price was $62.39 on July 17, 2000. (*Id.*)

Yet Lucent's results for the third fiscal quarter of 2000 failed to meet expectations. (*Id.* ¶ 12.)  In a July 20, 2000 press release announcing those results, McGinn informed investors that Lucent's business remained strong, that Lucent's pro forma revenues from continuing operations would grow about 15% for the fourth fiscal quarter of 2000, and that pro forma earnings per share would be roughly in line with revenue growth. (*Id.*)  In fact, Plaintiffs claim that McGinn's information was knowingly misleading. (*Id.*)  A complaint filed against Lucent in December 2000 by Nina M. Aversano, Lucent's former President, North America - Service Provider

Networks, allegedly reveals that McGinn knew then that fourth quarter revenue and earnings projections were unattainable. (*Id.*)

On October 10, 2000, Lucent disclosed information allowing analysts to determine that its optical networking business had actually declined 15% for the quarter and that it was increasing its reserve for uncollectible accounts receivable. (*Id.*)  On October 11, 2000, Lucent's share price fell more than $10 per share, closing at $21.19 (*Id.*)

On October 23, 2000, Lucent announced to analysts that fourth quarter revenues of $9.4 billion and pro forma earnings of $0.18 per share would meet expectations.  (*Id.* ¶ 14.)  By November 11, 2000, Lucent's share price increased to approximately $24 per share, leaving analysts to conclude that Lucent had begun to take a "'step in the right direction.'" (*Id.*)

On November 21, 2000, however, Lucent revealed that 2000 fourth quarter results reported on October 23, 2000, materially overstated the Company's results and, thus, that Lucent had missed analysts's expectations for that quarter. (*Id.* ¶ 15.) Specifically, Lucent stated that an unspecified "'revenue recognition problem'" had affected approximately $125 million of reported quarterly revenue. (*Id.*)  As a result, the Company announced that it would restate its fiscal quarter revenues and that both quarterly and yearly earnings would drop approximately two cents per share. (*Id.*)  Lucent share value then fell to $17.63. (*Id.*)

Finally, on December 21, 2000, Lucent disclosed that its November 21, 2000 announcement regarding its revenue recognition problem was inaccurate.  (*Id.* ¶ 16.)  In a December 21, 2000 announcement and conference call with analysts, Lucent indicated that it, again, would restate its fiscal fourth quarter revenues by reducing revenue for the quarter by $679 million to $8.7 billion - a figure $700 million less than the quarterly revenues initially reported and more than $400 million greater than the restatement amount announced on

November 21. (*Id.*)  The Company also revised its earnings per share for the quarter from $0.18 per share to $0.10 per share. (*Id.*)  Additionally, the Company revealed that it would take a $1 billion restructuring charge in late January 2001. (*Id.*)

The December 21, 2000 announcement revealed that Lucent's sales practices were responsible for, among other things, inappropriate recognition of substantial revenues for sales of products later returned because of either a prior agreement or the product's incompleteness. (*Id.* ¶ 17.)  Following this announcement, Moody's Investor Services downgraded Lucent's credit rating, and Lucent share price dipped significantly to $2.19 per share. (*Id.* ¶ 18.)

In their Fifth Amended Complaint, Plaintiffs plead two claims: (1) Lucent and the Individual Defendants did not reveal their allegedly improper sales and accounting practices and thus violated Section 10(b) of the Securities Exchange Act of 1934 by making false and misleading statements and failing to disclose material facts necessary to legitimately make those statements (Count I); and (2) the Individual Defendants, as controlling persons of the Company, caused the Company to engage in allegedly wrongful conduct and thus violate Section 20(a) of the Exchange Act (Count II).

## 2.  The Efforts in Investigating and Resolving the Case

During the course of the litigation, Co-Lead Counsel conducted an extensive investigation into the facts and circumstances relating to the allegations of the Fifth Amended Complaint.  In doing so, Co-Lead Counsel relied on private investigation and performed extensive discovery requiring, among other things, a review and analysis of more than three million pages of documents produced by Defendants and third parties.  They also hired experts to assist them in evaluating the merits of their claims and the risks of litigation.  Additionally, motion practice further enabled the parties to assess the arguments on both sides of the case.

Ultimately, their efforts resulted in their knowledge of the strengths and weaknesses of their case by, at least, the date when settlement negotiations began.

In September 2002, the Court stayed all further proceedings in this action and in related cases against Lucent and commenced, with each party's consent and voluntary participation,  a global mediation involving several securities fraud litigations against Lucent and/or its officers and directors: *In re Lucent Technologies, Inc. Securities Litigation*, 00-cv-621 (JAP), *Laufer, et. al. v. Lucent Technologies, et. al.*, 01-cv-5229 (JAP), *Pallas v. Schact*, et. al., 02-cv-2460 (JAP), *Cooper v. Schact*, 02-cv-4260 (JAP), *Preferred Life Ins. of New York, et. al., v. Lucent Technologies, Inc.*, MRS-L-1306-02 (N.J. Super.); *Reinhart & Smith v. Lucent Technologies, Inc., et. al.,* 01-cv-3491 (JAP); *In re Winstar Communications Sec. Litig.*, 01-cv3014 (S.D.N.Y.) (Daniels, J.,) and *In re Lucent Technologies, Inc., Derivative Litig.*, Civ. Action 18608 (Chancery Ct., DE) (Lamb, V.C.)   Co-Lead Counsel participated in the mediation and all related settlement conferences that the Court conducted.  Toward the same end, Co-Lead Counsel also conducted numerous settlement meetings and conferences outside of court.

Given Lucent's precarious financial condition at all times relevant to the negotiations, the Company's actual ability to pay was a vital consideration for any settlement.  Critical to the negotiations as well, Lucent agreed to settle this matter only if it could settle several related actions then pending against Lucent.  To evaluate Lucent's financial status, the Court created an "Ability to Pay Committee," which retained experts to study and provide opinions on Lucent's financial capabilities.  Co-Lead Counsel worked closely with their experts and learned the limits and constraints on any possible settlement.

Co-Lead Counsel ultimately proposed a settlement that maximized the recovery for the Class, yet permitted Lucent to continue operations and work on regaining its financial stability.

Once Co-Lead Counsel and Lucent agreed to a total, global settlement sum, Co-Lead Counsel engaged in time-consuming, challenging negotiations with counsel for all of the other participants in the global settlement negotiations.  In so dealing, Co-Lead Counsel successfully negotiated approximately 83% of the total settlement sum for the settlement of this particular action.

On September 22, 2003, the parties entered into a Stipulation (the "Stipulation") and Agreement of Settlement (collectively referred to as the "Settlement").  The Stipulation, its exhibits, and the Cover Agreement reflects the entire agreement regarding settlement among the parties.  *See* Stipulation ¶ 33.  The Settlement provides, among other things, that the Defendants will pay or cause to be paid to the Class cash, stock, and warrants valued at approximately $517 million when the Court preliminarily approved the Settlement.  (*See* Sept. 24, 2003 Order ("Preliminary Approval Order")).[3]  The Settlement is currently valued at approximately $ 610 million.

### 3.  The Court's Preliminary Approval Order and its Provisions

In its Preliminary Approval Order, this Court preliminarily certified this litigation to proceed as a class action for settlement purposes under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  As defined, the Class is all persons or entities who purchased Lucent common stock between October 26, 1999 and  December 20, 2000 (the "Class Period") and who

---

[3] The Settlement Fund for the benefit of the Class here consists of: (i)  $102,900,000 in cash from the proceeds of Lucent's Directors and Officers Liability Policies; (ii) $246,750,000 worth of additional cash or shares of Lucent common stock; (iii) $24,000,000 worth of shares of Avaya, Inc. ("Avaya") common stock; (iv) warrants to purchase 200 million shares of Lucent common stock at a price of $2.75 per share, which, according to Lucent, were worth $128,000,000 as of June 30, 2003, and $161,000,000 as of September 30, 2003; and (v) at least $10,500,000 from the proceeds Lucent will receive from the settlement of derivative actions brought on behalf of the Company.  Additionally, Lucent has agreed to pay up to $5 million to cover the costs of providing notice to the Class and administering the Settlement.

suffered damages as a result.  The Class excludes the Defendants, the Individual Defendants's immediate families, any entity in which any Defendant has a controlling interest, any person who was an officer or director of Lucent (or any Lucent subsidiary or affiliate) during the Class Period, and the legal representatives, heirs, successors or assignees of any excluded party.

This Court also approved the terms of the proposed settlement between the Plaintiffs and Defendants.  The Preliminary Approval Order scheduled a hearing to finally determine the fairness, reasonableness, and adequacy of the Settlement and directed the manner by which the Class should receive notice of the Settlement and fairness hearing.

## II.  Discussion

### A.  Class Certification

By its Preliminary Approval Order, this Court preliminarily certified this litigation to proceed as a class action for settlement purposes.  Class actions created for the purpose of settlement are well recognized under Rule 23 of the Federal Rules of Civil Procedure.  *See, e.g., In re Prudential Ins. Co. Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997) ("*Prudential I*"), *aff'd*, 148 F.3d 283 (3d Cir. 1998) ("*Prudential II*").  This Court finds that class certification remains appropriate.

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable.  A party need not precisely enumerate the class members to proceed as a class action. "Impracticability" does not mean "impossibility".  *See, e.g., Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397, 405 (D.N.J. 1990); *Vargas v. Calabrese,* 634 F. Supp. 910, 918 (D.N.J. 1986).  Here, joinder of all Class Members is impracticable since Lucent was the most widely-held stock in the country with over three billion shares of the Company's common stock

outstanding as of October 10, 2000, and Lucent common stock was actively traded throughout the Class Period.  Rule 23(a)(1) is thus satisfied.

Rule 23(a)(2) requires that questions of law or fact common to the class exist.  Rule 23(b)(3) requires that common questions predominate over individual questions.   Both provisions are satisfied here.   Rule 23 does not require that all class members be identically situated, just that substantial, common questions of either law or fact exist.  *See Prudential II*, 148 F.3d at 310; *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir. 1988).  Courts look to the "common nucleus of operative facts" to determine predominance of common questions.  *Safran v. United Steelworkers of Am., AFL-CIO,* 132 F.R.D. 397, 401 (W.D. Pa. 1989).  The application of the "fraud on the market" theory, which Plaintiffs rely upon here to establish the element of reliance, results in the predominance of common issues and permits class action treatment. *Basic Inc. v. Levinson*, 485 U.S. 224, 242-43 (1988).  Predominance is "readily met" in certain cases alleging securities fraud.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, the commonality requirement is easily satisfied because common questions of law and fact exist.  The basis of this suit is that Defendants issued false and misleading statements related to the Company's ability to manufacture optical networking products and the demand for those products and engaged in a pattern of improper revenue recognition practices to conceal the waning demand for the Company's products.  The Fifth Amended Complaint alleges that this conduct caused Lucent stock to trade at artificially inflated prices during the Class Period.  Thus, the claims of all Class Members arise from the same nucleus of operative facts and involve the same legal theories. The relevant questions in this case are susceptible to class-wide proof.  The commonality and predominance requirements of Rule 23 are thus satisfied.

Additionally, Rule 23(a)(3) requires that the class representatives's claims be typical of each class member's claims.  The "typicality" requirement is satisfied as long as the Lead Plaintiffs, the other representatives, and the Class "point to the same broad course of alleged fraudulent conduct to support a claim for relief".  *Zinberg*, 138 F.R.D. at 401 (quotation marks omitted).  Factual differences between the class representatives and other class members do not preclude a finding of typicality.  *See Prudential II*, 148 F.3d at 310.  Lead Plaintiffs and the other representatives stand in the same position as other Class Members here.  The allegations and the claims arising from them are the same for class representatives and the entire Class.  Thus, the typicality requirement of Rule 23(a)(3) is satisfied.

Rule 23(a)(4) requires adequacy of representation.  This is met if (1) the class representatives's interests are not antagonistic to those of other class members whom they seek to represent and (2) the class representatives's attorneys are qualified, experienced, and generally able to conduct the litigation.  *See Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).  These requirements are satisfied here.  First, Lead Plaintiffs and the other representatives are appropriate Class representatives.  The Lead Plaintiffs, in sworn certifications filed previously, have indicated their willingness to represent the Class.  In appointing the Lead Plaintiffs in this Action, the Court made a preliminary determination that Rule 23's adequacy and typicality requirements were satisfied.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii).  Neither Lead Plaintiffs nor the other representatives has interests antagonistic to those of the Class. Second, the attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States.  They are more than competent to conduct this action.  Co-Lead Counsel diligently and aggressively

represented the Plaintiffs before this Court and in the negotiations that resulted in the Settlement. Thus, the Rule 23(a)(4) standard is met.

Rule 23(b)(3) also requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. The class mechanism is the best way of resolving all class members's claims and sparing the judicial system the expense and burden of dealing with duplicative lawsuits. *Zinberg,* 138 F.R.D. at 402. "[C]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, 'since the effectiveness of the securities laws may depend in large measure on the application of the class action device.'" *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citation omitted). Judicial economy and sheer access to justice demonstrates that a class action here involves large numbers of Class Members with relatively small individual claims. The superiority requirement of Rule 23(b)(3) is met.

Accordingly, the Court grants class certification under Rule 23(a) and 23(b)(3). All persons or entities who satisfy the Class definition, except those persons or entities who requested exclusion on or before December 12, 2003, are members of the Class bound by the terms of the Settlement and the Order and Final Judgment and are entitled to share the benefits of the Settlement, subject to the terms and conditions of the Order and Final Judgment.

### B. Approval of the Settlement and Plan of Allocation

This matter requires the Court to scrutinize the Settlement including the proposed method for allocating monies. A court is obliged to protect class members's interests, *see In re Ikon Office Solutions Inc. Sec. Litig.* ("*In re Ikon*"), 194 F.R.D. 166, 174 (E.D. Pa. 2000), despite that "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re AremisSoft*

*Corp. Secs. Litig.*, 210 F.R.D. 109, 119 (D.N.J. 2002) (quoting *In re Gen. Motors Corp. Pick Up Truck Fuel Tank Litig.* ("*In re Gen. Motors Corp.*"), 55 F.3d 768, 784 (3d Cir. 1995)). Federal law requires courts to approve the settlement of a class action lawsuit.  Under Rule 23(e) of the Federal Rules of Civil Procedure, the Court should approve a class settlement if it is "fair, adequate, and reasonable." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) (citations omitted).  A court enjoys considerable discretion to determine whether a proposed settlement satisfies this standard. *See id.* at 482 (citing *Walsh v. Great Atl. & Pac. Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir. 1983)).  A district court must consider a number of factors when evaluating a settlement for its fairness and adequacy:

> (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975) (quotation omitted).

### 1. Complexity, Expense and Duration of the Litigation

Importantly, this factor is "intended to capture the probable costs, in both time and money, of continued litigation.  *In re Gen. Motors Corp.*, 55 F.3d at 811.  Securities class actions are inherently complex, *see In re Ikon*, 194 F.R.D. 166, 179, and this case is no exception. This case involves a detailed examination of Lucent's optical networking technology and complex accounting issues concerning revenue recognition.  Indeed, the complicated history of Lucent's financial troubles resulted in the filings of no less than five amended complaints.  A trial might

16

well turn on close questions of evidence and fact.  Absent settlement, substantial risks of an ability to recover exist, particularly the risk that Lucent would be unable to pay a judgment.

Moreover, the expense of further pursuing the litigation against Lucent would be substantial.  While the parties had already spent almost four years litigating this case and reviewed and analyzed millions of pages of relevant documents by the time they reached the Settlement, their efforts would have required considerably more time and money if they ultimately tried this case.  For example, if the case had not settled, Plaintiffs had intended to depose Lucent's senior management representatives, the Individual Defendants, and a substantial number of non-parties.  Additionally, Defendants would have likely filed a motion for summary judgment if the case proceeded, and the Plaintiffs's response to such motion also would have necessitated considerable time and effort.  Assuming the claims would have survived a summary judgment motion, the Plaintiffs would have amassed many additional hours of work at great expense for trial preparation.  On liability alone, a trial would have involved substantial attorney and expert time, voluminous documentary and deposition evidence, vigorously contested motions, and the considerable use of judicial resources.   Not only would a trial have significantly drained any potential recovery for the Class, it also would have guaranteed only that the outcome was uncertain for the Class.

Even assuming that the Class could recover a larger judgment after trial, the necessary delay through a trial, post-trial motions, and the appellate process would likely deny the Class any recovery for years, an unfavorable result for all parties:  "Avoiding this unnecessary and unwarranted expenditure of resources and time benefit[s] all parties."  *Computron,* 6 F. Supp. 2d at 317; *see G.M. Trucks,* 55 F.3d at 812.  Accordingly, the Settlement secures a substantial

recovery without further litigation, delay, expense, or uncertainty, and this factor weighs in favor of the Settlement.

### 2. Class Reaction to the Settlement

"This factor attempts to gauge whether members of the class support the settlement." *Prudential II*, 148 F.3d at 318. Courts construe class members's failure to object to proposed settlement terms as evidence that the settlement is fair and reasonable. *See Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 631 (E.D. Pa. 1986) ("[U]nanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight."). However, courts must be cautious about "inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Corp.*, 55 F.3d at 812, particularly in securities cases where shareholders may have such minimal stock holdings that it is unwise to invest the time and resources to contest a settlement. *See id.; Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993).

The Notice of Pendency of Class Action, Hearing on Proposed Settlement and Attorney's Fee Petition and Right to Share in Settlement Fund (the "Notice") informed potential Class Members of the terms of the proposed Settlement, the application for attorney's fees, and the reimbursement of expenses. The Notice advised Class Members of their right to object to the proposed Settlement and/or application for attorney's fees and expenses and their right to request exclusion from the Class. On October 7, 2003, 793,964 copies of the Notice and proof of claim ("Notice Packet") were mailed by First Class Mail to potential Class Members by the Claims Administrator. (Garr Notice Aff. ¶ 4.) A summary notice was also published in the national edition of The Wall Street Journal and was issued over PR Newswire on October 16, 2003. (Garr Notice Aff. ¶¶ 6-7.) In response to subsequent requests from brokerage firms, between

October 8, 2003 and November 11, 2003, another 1,545,163 copies of the Notice Packet were

mailed by the Claims Administrator to individuals identified as potential Class Members, and

426,155 copies of the Notice Packet were sent to investment brokers for release to their clients.

Also, 23,455 Notice Packets were sent to potential Class Members at updated addresses received

from the post office when the original mailed Notice Packets were returned as undeliverable.

(Garr Notice Aff. ¶ 5.)  In total, as of November 11, 2003, the Claims Administrator had mailed

or delivered 2,788,737 Notice Packets either directly to potential Class Members or to brokers to

be forwarded to their respective clients.  (Garr Notice Aff. ¶ 5.)  Between November 11, 2003

and November 26, 2003, an additional 200,947 copies of the Notice Packet were disseminated.

As of November 26, 2003, the Claims Administrator mailed or delivered 2,989,684 copies of the

Notice Packet.  (Garr Broker Mailings Aff. ¶ 11.)  The Claims Administrator also maintains a

toll-free telephone system and a website to inform potential Class Members of the Settlement.

(Garr Notice Aff. ¶¶ 8, 9.)

The Court finds that the Notice fully and fairly informed Class Members of  the

Settlement terms, the fees application, and their rights to respond to either and/or both.  It further

finds that Notice was given consistent with the terms of the Preliminary Approval Order, and

Class Members were afforded a fair opportunity to object or opt-out.[4]  To date, the Court has

received about ten objections to the Settlement.  The absence of objections from the

overwhelming majority in response to the Notice to Class Members should be considered in

approving the Settlement.  *See AremisSoft*, 210 F.R.D. at 124; *see also Stoetzner*, 897 F.2d at

118-19 (concluding that, when "only" 29 members of a class of 281 objected, the response of the

class as a whole "strongly favors settlement").  Though the Court has received a number of other

---

[4]         At the December 12, 2003 hearing, the Court extended the time to opt out to
December 12, 2003.

letters expressing opinions regarding the Lucent settlement and requesting to opt-out in some cases, these letters are written by individuals who are not Class Members.  Even assuming these individuals are Class Members, their requests are untimely.  Irrespective of this, these letters neither add anything new to the Court's analysis nor change the Court's analysis in any way.  Ever mindful of the caution about "inferring support from a small number of objectors to a sophisticated settlement," *In re Gen. Motors Corp.*,  55 F.3d at 812, the Court concludes that the favorable reaction of the Class is strong evidence that the Settlement is indeed fair, reasonable, and adequate, and should be approved.  This factor supports the Settlement.

### 3. The Stage of Proceedings and Amount of Discovery Completed

Parties should have an "'adequate appreciation'" of the merits in settling a case.  *Prudential II*, 148 F.3d at 319 (quoting *In re Gen. Motors Corp.*, 55 F.3d at 813).  While the type and extent of discovery taken are relevant to the propriety of a settlement, settlements reached early are still favored. *Computron*, 6 F. Supp. 2d at 318; *see also Weiss v. Mercedes Benz of North Am., Inc.,* 899 F. Supp. 1297, 1301 (D.N.J.) (approving settlement while the "case is still in the early stages of discovery"), *aff'd,* 66 F.3d 314 (3d Cir. 1995).

Plaintiffs, through their Counsel, have conducted a thorough evaluation of the strengths and weaknesses of the case as well as of Lucent's financial ability to fund a settlement or satisfy a judgment.  Co-Lead Counsel conducted an exhaustive investigation into the facts and circumstances of Lucent's conduct, which included interviews with more than 200 hundred witnesses and the review and analysis of more than three million pages of documents produced by Lucent and other parties.  Co-Lead Counsel also retained and consulted with experts in optical networking technology, retained and consulted with experts in forensic accounting regarding complex accounting issues, and retained and consulted with finance experts to analyze Lucent's

financial condition, its future business prospects, and the risk of bankruptcy.  The briefing on the motions to dismiss and discovery disputes as well as the lengthy settlement negotiations shed further light on the strengths and weaknesses of the case, the risks of litigation, and the issues the Class would face at trial.  The parties had more than a sufficient basis for assessing the strengths and weaknesses of the claims when they submitted the Settlement to the Court for approval.  This factor thus weighs in favor of the Settlement.

### 4.  The Risks of Establishing Liability and Damages

#### a.  Liability

A court must also "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement." *Prudential II,* 148 F.3d at 319.   In doing so, however, a court should not conduct a "mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel[.]" *In re Ikon,* 194 F.R.D. at 181 (citation omitted).  To prevail at a trial in this case, the Class would need to link each Defendant to a material omission or a misstatement that damaged the Class. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193  n.12 (1976).  In addition, the Class must also establish that Defendants acted with scienter on all of the Section 10(b) claims.

To succeed on their claims under the Exchange Act, Lead Plaintiffs would have to establish, among other things, that each Defendant was responsible for a material omission or a misstatement that caused damage to the Class and that Defendants acted with scienter.  *See TSC Indus., Inc.,* 426 U.S. at 438; *Hochfelder,* 425 U.S. at 193 n.12.  Lead Plaintiffs's ability to prove their claims and to effectively rebut Lucent's defenses was far from certain.  Thus, for example,

even if Plaintiffs were able to prove that Lucent's statements regarding its optical networking products were materially false or misleading, Plaintiffs also would have to prove that Lucent's senior management knew that these problems were occurring in various facilities.  (*See* Lead Counsel's Jt. Decl. ¶ 132.)  Additionally, the Plaintiffs would have to prove that the financial results announced during the Class Period were false and misleading because they overstated the Company's sales and revenues.  This allegation would have been particularly difficult to prove because an agreement between Lucent and the SEC allowed Lucent to refrain from restating its financial statements or paying any fines or penalties.

Moreover, when this Court stayed the litigation in September 2002, Defendants's motion for partial summary judgment on statute of limitations grounds was pending.  In that motion, Defendants contended that many of Plaintiffs's allegations were time-barred because they were not asserted until July 2002.  The Court never decided that motion, dismissing it without prejudice when the settlement negotiations began.

The Plaintiffs also faced significant obstacles in establishing scienter.  They would have had to prove that Lucent senior executives had been informed of the specific problems with the Company's optical networking products and that the alleged false statements regarding those products were knowingly false when made.   Similarly, to prove allegations that Lucent issued false and misleading financial statements throughout the Class Period, Lead Plaintiffs would have had to demonstrate that Lucent and the Individual Defendants knew or recklessly disregarded that those financial statements overstated Lucent's revenues and violated GAAP.  To be sure, Defendants had counter-arguments.  They could have claimed that, to the extent that any wrongdoing occurred, Lucent's senior management was not involved, but in fact were victims of others's actions.  To support this, Defendants could point to the fact that Lucent's auditor had

reviewed the financial statements allegedly false and misleading financial statements. Defendants

could also contend that the Company's November 21, 2000 and December 21, 2000

announcements resulted from a comprehensive investigation by Lucent and its outside counsel,

which disclosed the revenue recognition issues to the public immediately after they became

known by Lucent senior management.  In sum, proving scienter would have been very difficult.

Based on all of these risks and contingencies, the Settlement is reasonable in light of the risks

involved in establishing liability.  This factor supports the Settlement.

### 2.  Damages

In addition to defenses to liability, Lead Plaintiffs would have had to overcome any

defenses regarding damages that Defendants surely would have asserted.  For example, Lucent

likely would have argued that the drop in its stock price was largely the result of the burst of the

internet bubble, not the Company's allegedly false and misleading statements.  Indeed, during the

Class Period, in calendar year 2000, the NASDAQ index reached 5,000 only to precipitously fall

to less than 2,500 as of December 21, 2000, the end of the Class Period.  Accordingly, the loss

causation and damages assessments of the parties's experts would vary substantially, and trial

would have been a "battle of experts."  The outcome of such battles is never predictable, and the

Court recognizes the very real possibility that a jury could be swayed by defense experts, who

would seek to minimize the Class Members's losses or to show that the losses were attributable to

factors other than the alleged misstatements and omissions.  *See also Robbins v. Kroger Props.*

*Inc.,* 116 F.3d 1441 (11th Cir.), *reh'g en banc denied,*  (11th Cir. 1997) (finding no loss causation

and overturning $81 million jury verdict); *Prudential I*, 962 F. Supp. at 539 (noting that divergent

expert testimony leads inevitably to a battle of the experts).  As a result, defense experts

conceivably could have swayed a jury that damages should be reduced or that losses are

attributable to factors unrelated to the alleged fraudulent conduct. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) (recognizing risks associated with jury being confronted with competing damage expert opinions). The Settlement thus eliminates the inherent, unavoidable risks of litigation of this nature, and this factor supports the Settlement.

   5. *The Risks of Maintaining the Class Action Through Trial*

   Class certification influences the value of a class action. "[N]ot only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *In re Gen. Motors Corp.,* 55 F .3d at 817; *see also In re Ikon,* 194 F.R.D. at 180-81 . Here, Defendants have made clear that they would mount a vigorous resistance to class certification and attack one of the linchpins of Lead Plaintiffs's theory of class reliance, the fraud-on-the-market theory. However, no other facts or circumstances suggest a particular risk of decertification. Thus, consideration of this factor neither favors nor discourages the Settlement. *See In re Ikon,* 164 F.R.D. at 183.

   6. *The Ability of the Defendants to Withstand a Greater Judgment*

   Given that Defendants are unable to withstand a greater judgment, this factor supports the Settlement. *See In re Ikon,* 194 F.R.D. at 183 (noting that the defendant's inability to pay a greater sum favored settlement). Unquestionably, Lucent could not withstand a judgment reflecting the magnitude of potential damages in this Action. A judgment based purely on damages that did not account for Lucent's ability to pay could easily have reached billions of dollars, based on Plaintiffs's damages experts's assessment and the fact that the stock price had declined from $84 to less than $13 per share during the Class Period. (*See* Decl. of Frank C.

Torchio ¶ 39.)  After having allegedly caused billions of dollars in damages to investors, Lucent's financial condition substantially deteriorated during the litigation, and the Company could not have satisfied a judgment of this magnitude.

The decline in Lucent's financial condition from the end of the Class Period in December 2000 until September 2002, when negotiations began, was dramatic and severe.  Accordingly, when mediation began, the Plaintiffs faced a Company that was slowly degenerating.  The Company's underlying weakness and deteriorating financial condition was reflected in the stock price and the financial press.  By October 2002, the stock price hit an all-time low of $0.58 per share.  News articles in late 2002 reported that Lucent likely would be forced into bankruptcy or reorganization, to the detriment of shareholders.  (*See* Lead Counsel's Jt. Decl. ¶ 115.)  *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (citation omitted) ("The "'prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures.'")

In light of Lucent's financial condition, Co-Lead Counsel retained independent experts to evaluate Lucent's ability to pay.  These experts engaged in an extensive analysis of Lucent's finances.  Their analysis included review of thousands of pages of non-public documents received from Lucent detailing the Company's financial position. They also held multiple meetings to enable them to understand Lucent's financial condition and create innovative sources of value.  Co-Lead Counsel met with Lucent's senior officers, including its Chairman and its Chief Financial Officer, to discuss Lucent's financial condition.

Based on these circumstances, the Settlement is extraordinary; indeed, it is one of the largest recoveries ever in a securities class action.  This consideration alone strongly supports approval of the Settlement.  In addition, the recovery exceeds the half-billion mark largely as a

result of some key, innovative components to the Settlement. First, the Settlement includes warrants issued by Lucent that allow Class members to benefit from a potential recovery in the fortunes of the Company and the price of the stock. While the Court does not know with certainty what the value of the warrants will be at the time of distribution since their value fluctuates with the price of Lucent common stock, the Company now values the warrants at $221 million. Second, Avaya (a Lucent spin-off) will contribute $24 million worth of its common stock to the Settlement. This significant contribution to the Settlement consideration resulted from Co-Lead Counsel's diligence in pursuing all possible avenues of recovery and their determination that Avaya was contractually bound to contribute to any settlement reached in this Action. The warrants and the Avaya contribution represent a significant portion of the Settlement.

In sum, while Lucent could not fund a cash settlement and could have filed bankruptcy at any moment during the litigation, the efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the benefit of the Class. No doubt, this factor strongly supports the Settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery

The Court also must consider how the Settlement compares to the best possible recovery for the Class. "'[T]he present value of the damages the plaintiffs would likely recover if successful, appropriately discounted for the risks of not prevailing, should be compared with the amount of the proposed settlement.'" *Prudential II,* 148 F.3d at 322 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 806); *see also In re Ikon,* 194 F.R.D. at 183-84 (same).

The Settlement is reasonable in light of the best possible recovery and the attendant risks of litigation. The Settlement yields substantial and immediate benefits. Although the Class

allegedly suffered billions of dollars in damages, the best possible recovery here depended entirely on Lucent's ability to pay.  Based on Lucent's financial condition, it was impossible for Lucent to satisfy a judgment for billions of dollars.  Indeed, as noted above, in September 2002, when settlement negotiations began, the stock price reached an all-time low of $0.58 per share, and the Company had a market capitalization of less than $2 billion.  The Company could not fund a cash settlement.

In addition to obtaining all available consideration from Lucent, Lead Plaintiffs and Co-Lead Counsel also exhausted all other possible sources of cash.  The remaining proceeds from Lucent's directors and officers' insurance policies will be used in full to pay the Class a total of $102.9 million in cash, and the Class will receive $24 million worth of Avaya common stock. Lead Plaintiffs and Co-Lead Counsel succeeded in obtaining the Avaya contribution only after heated and vigorous settlement negotiations with Avaya, which initially declined to make any contribution to the settlement.  The Class will also obtain at least $10,500,000 from the proceeds Lucent shall receive from settlement of derivative actions brought on behalf of the Company.

In sum, Lead Plaintiffs and Co-Lead Counsel evaluated Lucent's ability to pay through expert analyses. They determined that Lucent's cash position was extremely weak and that any substantial recovery would have to be based on alternative sources of consideration other than cash. They vigorously and aggressively pursued every possible source of value, including Avaya and Lucent's derivative cases.  Ultimately, they obtained a Settlement valued at approximately $517 million when preliminarily approved by this Court, which is one of the largest securities settlements ever achieved.  The Settlement is reasonable in light of the best possible recovery and represents "a very substantial portion of the likely recovery in this case, and is unquestionably

better than another 'possibility' -- little or no recovery at all." *In re Saxon Sec. Litig.,* Nos. 82-cv-3103 (MJL), 1985 WL 48177, at *13 (S.D.N.Y. Oct. 30, 1985).

Further, the Settlement must be balanced against all of the risks of further litigation. Here, the Settlement was reached after the Court denied Defendants's motion to dismiss, but before the Court decided Defendants's motion for partial summary judgment and Lead Plaintiffs's motion for class certification, both of which were pending when mediation began. A victory for Plaintiffs on the summary judgment motion was far from certain. Again, clear risks of establishing scienter and loss causation also existed.

Moreover, many securities cases have been lost at trial, on post-trial motion, or on appeal. *See Robbins,* 116 F.3d 1441 (overturning an $81 million jury verdict for the plaintiff class on loss causation grounds and dismissing the entire litigation). The factual and legal uncertainties of this case, the inherent unpredictability and delay of a lengthy and complex trial, and the appellate process that would surely follow any victory for Lead Plaintiffs make the Settlement both reasonable and appropriate.

**C.  Allocation Plan**

Next, this Court must evaluate the Plan of Allocation. The Settlement includes a Plan of Allocation proposing how the Settlement Fund shall be distributed to Class Members who submit valid and timely Proofs of Claim. (Rosenbaum Aff., Ex. A at 6.) "Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate." *Computron*, 6 F. Supp. 2d at 321 (citations omitted). A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable. *See id.*; *see also In re Ikon*, 194 F.R.D. 166, 183-84.

28

The Settlement contains a proposed Plan of Allocation establishing the method by which the Settlement cash and securities (Lucent common stock, Avaya common stock, and Lucent Warrants) will be distributed to Class Members submitting acceptable Proofs of Claim.  This Plan, set forth in the Notice, was developed by Co-Lead Counsel after consulting with their damages experts.   No Class Member has objected to the Plan of Allocation.  The Plan of Allocation reflects the allegation that the prices of Lucent securities were artificially inflated due to the allegedly false and misleading statements made by Defendants during the Class Period. Accordingly, the plan is based on the estimated losses of the Class Members attributable to the alleged misstatements.  This, in turn, depends on the dates on which the stock was purchased and whether the stock was sold or held through the various alleged partial disclosures that occurred during the Class Period (such as the October 10, 2000 and November 21, 2000 disclosures), or held through the end of the Class Period.  (*See* Decl. of Frank C. Torchio ¶¶ 23-32.)  Courts have routinely approved plans of allocation that provide different payments to class members.  *See Cendant*, 264 F.3d at 248-49.  "[W]hen real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh 'distribution of the settlement . . . in favor of plaintiffs whose claims comprise the set' that was more likely to succeed.'"  *PaineWebber*, 171 F.R.D. at 132 (citations omitted).  Similarly, in *In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *2 (N.D. Cal. June 18, 1994), the court approved a plan of distribution in which the class members's recovery ranged from 10% to 100% of the damages calculated by the expert.

The Claims Administrator shall determine each Authorized Claimant's pro rata share of the Settlement securities based upon each Authorized Claimant's "Recognized Claim" as

calculated in accordance with the formula set forth in the Plan of Allocation.[5]  Each Authorized

Claimant will be allocated a pro rata share of the Net Settlement Fund based on the Recognized

Claim, as compared to the total Recognized Claims of all Authorized Claimants.

The favorable reaction of the Class supports approval of the proposed Plan of Allocation.

Despite that over 2.98 million Notices have been distributed, no Class Member has objected to

the Plan of Allocation.  The proposed Plan of Allocation is a fair, reasonable, and adequate

method for allocating the Settlement Fund among the various members of the Class.

### III.  Conclusion

For the reasons explained above, the Court approves the Settlement as just and reasonable.

A Final Judgment and Order has been previously entered.  This Opinion shall be read in

conjunction with that Final Judgment and Order.

_____
S/ JOEL A. PISANO, U.S.D.J.

Date: February 24, 2004

---

[5]        The "Recognized Claim Formula" is not intended to be an estimate of the amount
a Class Member might have been able to recover after a trial and is not an estimate of the amount
that will be paid to Authorized Claimants under the Settlement.